**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Jane Doe, et al., | No. CV-24-02259-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Kris Mayes, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. 14). The Court previously granted an agreed-upon temporary restraining order to preserve the status quo while Defendants prepared an opposition to Plaintiffs' Motion. (Docs. 35, 36, 42.) The Motion now being fully briefed, with oral argument held on October 30, 2024, the Court will now address the Motion's merits. (Docs. 14, 86, 95.) For the foregoing reasons, the Motion will be denied.

## I.    BACKGROUND

During the 2024 legislative session, the Arizona Legislature passed, and the Governor signed, Senate Bills 1236 and 1404—the subject matter of this litigation. Senate Bill 1236 adds information to Arizona's sex offender website. 2024 Ariz. Sess. Laws ch. 158 § 1 (hereinafter "S.B. 1236"); *see also* A.R.S. § 13-3827 (2021). More specifically, it adds the information of any offender eighteen years of age or older who commits sexual assault, commercial sexual exploitation of a minor, and child prostitution. *See* S.B. 1236 § 1. As well as the information of any offender twenty-one years of age or older who

commits an offense listed in A.R.S. § 13-3827(A)(2)(b), (d)-(f), (h)-(m)[1] and is sentenced pursuant to A.R.S. § 13-705.[2] *See id.* § 1.

These changes to Arizona's sex offender website will impact certain level one sex offenders.[3] Prior to the enactment of Senate Bill 1236, level one offenders had their information published on Arizona's website if they committed an offense listed in A.R.S. § 13-3827(A)(2)(b), (d)-(f), (h)-(m) against a child under twelve years old; or if they committed sexual assault, commercial sexual exploitation of a minor, child prostitution, or child sex trafficking. *See* A.R.S. § 13-3827 (2021). Senate Bill 1236 takes the offenses already listed in A.R.S. § 13-3827(A)(2)(b), (d)-(f), (h)-(m) and uses them to now also require publication when a level one offender, twenty-one years of age or older, commits one of the listed offenses and is subsequently sentenced pursuant to A.R.S. § 13-705. *Compare* S.B. 1236 § 1, *with* A.R.S. § 13-3827 (2021). With there being no change to the offenses qualifying a level one offender for publication, and with level one offenders already being subject to publication if the victim was under twelve years old, Senate Bill 1236 primarily changes the publication requirements based on the age of the victim and the offender's age when committing the crime.

Senate Bill 1404 changes the reporting requirements for sex offenders. 2024 Ariz. Sess. Laws ch. 57 §§ 1-2 (hereinafter "S.B. 1404"). Sex offenders must register with the local sheriff's office anytime they enter and remain in a county for more than seventy-two hours. A.R.S. § 13-3821(A). To register, the offender must be fingerprinted, photographed,

---

[1] Offenses listed in A.R.S. § 13-3827(A)(2)(b), (d)-(f), (h)-(m) include: sexual exploitation of a minor, sexual abuse, molestation of a minor, sexual conduct with a minor, child sex trafficking, taking a child for the purpose of prostitution, luring a minor for sexual exploitation, aggravated luring of a minor for sexual exploitation, and continuous sexual abuse of a child.

[2] Sentences pursuant to A.R.S. § 13-705 involve "dangerous crimes against children." Such crimes are listed in A.R.S. § 13-705(T)(1)(a)-(w) and involve victims under fifteen years of age. A.R.S. § 13-705(T)(1). When an adult commits a qualifying offense against a child under fifteen, A.R.S. § 13-705 imposes sentencing ranges depending on the crime and whether the individual is a repeat offender. *See id.* § 13-705(A)-(M). The ranges span from a statutory minimum of two-and-a-half years imprisonment to a statutory maximum of life imprisonment. *See, e.g., id.* § 13-705(A), (H).

[3] After being released from confinement, sex offenders are categorized and placed into one of three notification levels. A.R.S. § 13-3825(D). Level one is for offenders who have the lowest risk of reoffending, and level three is for those who have the highest risk. *See State v. Trujillo*, 248 Ariz. 473, 476 (2020).

and disclose information like their name, website identifier, and vehicle information. A.R.S. § 13-3821(I). Senate Bill 1404 adds to these requirements by ordering an offender who has "legal custody of a child who is enrolled in school" to report their "child's name and enrollment status" while registering. S.B. 1404 § 1. If the child's enrollment status changes, Senate Bill 1404 requires the offender to report the change within seventy-two hours. *Id.* § 2.

Senate Bill 1404 also expands the class of sex offenders who are subject to community notification. *Id.* § 3. Prior to Senate Bill 1404, local law enforcement only disseminated the information of level two and level three sex offenders to "the surrounding neighborhood, area schools, appropriate community groups, and prospective employers." A.R.S. § 13-3825(C)-(D) (2017). Senate Bill 1404 adds "[l]evel one offenders who have been convicted of a dangerous crime against children" to the class whose information is disseminated by local law enforcement. S.B. 1404 § 3. In addition, it requires local law enforcement to notify a child's school when the child's parent or legal guardian is a sex offender subject to community notification—expanding the reach of community notification beyond "area schools" to wherever an offender's child attends. *See id.* Information disseminated during the community notification process includes the offender's photograph, exact address, offender status, and criminal background. A.R.S. § 13-3825(C).

Plaintiffs are four individuals who claim their reporting and monitoring requirements will be impacted by Senate Bills 1236 and 1404. The first plaintiff, Jane Doe, was convicted of two counts of child molestation in 2006.[4] (*See* Doc. 14-1 ¶ 3, ¶ 5.) Both counts were classified as dangerous crimes against children under A.R.S. § 13-705. (*Id.* ¶ 6). After completing her term of incarceration, Jane Doe underwent Arizona's sex offender risk assessment screening and was classified as a level one offender. (*Id.* ¶ 12.) She will face new community notification requirements under Senate Bill 1404, and her status as a sex offender will be published online under Senate Bill 1236. (*Id.* ¶ 26.) Jane

---

[4] Without opposition from Defendants, the Court granted Plaintiffs' Motion to proceed under pseudonyms. (Doc. 33.)

Doe claims these changes to the law will cause "fear for [her] physical safety," loss of her home, "ostracization from [her] community," and loss of career opportunities. (*Id.* ¶¶ 27-30.)

The second plaintiff, John Doe I, is a level one sex offender who pleaded guilty and was convicted of "attempted sexual contact with a minor, sexual abuse, and public sexual indecency" in 2016. (Doc. 14-2 ¶ 3, ¶ 8.) Two of those crimes were classified as dangerous crimes against children under A.R.S. § 13-705. (*Id.* ¶ 4.) As a level one offender, John Doe I will face new community notification requirements under Senate Bill 1404, and his status as a sex offender will be published online under Senate Bill 1236. (*Id.* ¶ 26.) He claims these changes will impact his business through lost customers. (*Id.* ¶ 28.)

The third plaintiff, John Doe II, is a level one offender who pleaded guilty to and was convicted of attempted child molestation in 2008. (Doc. 14-3 ¶ 4, ¶ 9.) That charge was classified as a dangerous crime against children under A.R.S. § 13-705. (*Id.* ¶ 6.) John Doe II has legal custody of his minor child who is currently enrolled in school. (*Id.* ¶ 3.) Senate Bill 1404 will require John Doe II to begin reporting information about his child to the local sheriff's office. (*Id.* ¶ 29.) It also will require local law enforcement to notify his child's school about his status as a sex offender. (*Id.*) John Doe II alleges these requirements will cause his child to "face risks of harassment, ostracization, and bullying." (*Id.* ¶ 30.) Moreover, John Doe II claims he "will no longer feel free to visit [his] child at their school for fear" of negative social consequences, and he would be forced to reveal to his child his status as a sex offender before an appropriate age. (*Id.* ¶¶ 31-33.)

The final plaintiff, Minor Doe, is the minor child of John Doe II. (Doc. 14-4 ¶ 4.) Minor Doe's name, school, and enrollment status will be reported to the local sheriff's office under Senate Bill 1404. Minor Doe claims the reporting will violate Minor Doe's privacy. (*Id.* ¶ 10, ¶ 12.) Minor Doe also claims bullying will occur if the notification requirements in Senate Bill 1236 go into effect. (*Id.* ¶ 11.)

## II.     LEGAL STANDARD

A party facing irreparable harm prior to the conclusion of litigation may ask a court to grant a temporary restraining order or preliminary injunctive relief. Fed. R. Civ. P. 65(b). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). For a court to issue a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). "When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Normally, a court must consider all four *Winter* factors when analyzing a request for injunctive relief. *Id.* Yet, when the movant is unable to show a likelihood of success on the merits, or that there is at least a "serious question[] going to the merits," the remaining three factors need not be considered. *See id.*; *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)). A serious question on the merits is a lesser showing than likelihood of success on the merits. *Shell Offshore, Inc.*, 709 F.3d at 1291. It only warrants injunctive relief when "the 'balance of hardships tips *sharply* in the movant's favor,' and the other two *Winter* factors are satisfied." *See id.* (quoting *All. for the Wild Rockies*, 632 F.3d at 1134-35).

## III.     ANALYSIS

### A.     Likelihood of Success on the Merits

#### 1.     Ex Post Facto Clause

Article I, Section 10, of the United States Constitution provides "[n]o State shall . . . pass any . . . ex post facto [l]aw." Known as the Ex Post Facto Clause, this command prevents the passage of any law "impos[ing] a punishment for an act which was

not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 4 Wall. 277, 325-26 (1866)). In *Smith v. Doe*, 538 U.S. 84 (2003), the United States Supreme Court outlined "the standard for evaluating whether a sex offender registration program violates the Ex Post Facto Clause." *United States v. Elkins*, 683 F.3d 1039, 1044 (9th Cir. 2012). That standard comprises two steps. First, a court must "determine whether the legislature intended to impose a criminal punishment or whether its intent was to enact a nonpunitive regulatory scheme." *Am. C.L. Union of Nev. v. Masto*, 670 F.3d 1046, 1053 (9th Cir. 2012). Intent by a legislature to impose criminal punishment violates the Ex Post Facto Clause and ends any further inquiry. *Id.* If, however, a legislature intends to create a civil regulatory scheme, the analysis shifts to *Smith*'s second step: whether the law is "so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Id.* (quoting *Smith*, 538 U.S. at 92).

### i.    Legislative Intent

*Smith*'s first step examines a "statute's text and its structure to determine the legislative objective." 538 U.S. at 92. In *Clark v. Ryan*, the Ninth Circuit Court of Appeals held Arizona's sex offender registration scheme serves a regulatory, nonpunitive purpose. *See* 836 F.3d 1013, 1016 (9th Cir. 2016). The court also found the purpose of Arizona's internet sex offender website was to provide the public with information, *id.* (citing *State v. Henry*, 224 Ariz. 164, 169 (App. 2010)), and Arizona's notification requirements are intended to protect communities from repeat offenders. *See id.*; *see also State v. Trujillo*, 248 Ariz. 473, 478 (2020). While *Clark* did not address Arizona's requirement for sex offenders to register with their local sheriff's office, in a separate case, the Arizona Supreme Court explained the requirement seeks to "provide law enforcement with 'a valuable tool' in locating sex offenders by giving them 'a current record of the identity and location of' such offenders.'" *Trujillo*, 248 Ariz. at 478 (quoting *State v. Noble*, 171 Ariz. 171, 177 (1992) *overruled in part by Trujillo*, 248 Ariz. at 480).

"[S]tatutory interpretation must 'begi[n] with,' and ultimately heed what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (citation omitted). Senate Bills 1236 and 1404 do not contain any language or labels indicating the new requirements are criminal in nature. *See Smith*, 538 U.S. at 93 (stating labels can be informative of legislative intent). They also do not impose any new penalties showing a desire to transform Arizona's regulatory scheme into one designed to punish. *See id.* Thus, nothing on the face of Senate Bills 1236 and 1404 suggest the Arizona Legislature sought to do anything other than further its legitimate, regulatory goals of community protection and easy identification by law enforcement. *See id.*

Looking more broadly at the impact of Senate Bills 1236 and 1404 on Arizona's current sex offender scheme, the registration requirements in place prior to Senate Bill 1404 required sex offenders to provide their biometric information, online identifier, vehicle information, and place of residence (among other things) when registering with their local sheriff's office. A.R.S. § 13-3821 (2021); *see also Smith*, 538 U.S. at 92 (noting the structure of a statute can be instructive in determining legislative intent). Senate Bill 1404 adds to these requirements by having sex offenders register their child's name and enrollment status. S.B. 1404 § 1. That additional information fits within the stated purpose of sex offender registration—providing law enforcement with information that can be used to locate a sex offender. *See Trujillo*, 248 Ariz. at 478. The Court, therefore, finds the new reporting requirements do not indicate an intent by the Arizona Legislature to alter Arizona's nonpunitive regulatory objectives.

Next, under the publishing requirements in place prior to the enactment of Senate Bill 1236, level one offenders generally had their information published on Arizona's sex offender website if the victim was under twelve years old or if they committed a serious sexual crime. *See* A.R.S. § 13-3827 (2021). Senate Bill 1236 expands the class of level one offenders whose information is published on Arizona's website. It adds the information of any level one offender who was twenty-one years of age or older when they committed an offense listed in A.R.S. § 13-3827(A)(2)(b), (d)-(f), (h)-(m), provided the offender was

sentenced pursuant to A.R.S. § 13-705. *See* S.B. 1236 § 1.

Sentences pursuant to A.R.S. § 13-705 involve "dangerous crimes against children." Such crimes are listed in A.R.S. § 13-705(T)(1)(a)-(w) and involve victims under fifteen years of age.[5] A.R.S. § 13-705(T)(1). When an adult commits a qualifying offense against a child under fifteen, A.R.S. § 13-705 imposes sentencing ranges depending on the crime and whether the individual is a repeat offender. *See id.* § 13-705(A)-(M). The ranges span from a statutory minimum of two-and-a-half years imprisonment to a statutory maximum of life imprisonment. *See, e.g.*, *id.* § 13-705(A), (H).

Importantly, the statutory changes enacted by Senate Bill 1236 match the regulatory goals of providing the public with information. *See Clark*, 836 F.3d at 1016 (finding the purpose of Arizona's internet sex offender website was to provide the public with information). Under the old scheme, a level one offender already had their information published if they committed a qualifying offense and their victim was under twelve years old. A.R.S. § 13-3827 (2021). Senate Bill 1236 takes the offenses already listed under the old scheme and adds a new group of level one offenders who are subject to publication. S.B. 1236 § 1. That new group is restricted to level one offenders who are sentenced pursuant to A.R.S. § 13-705. *Id.* A sentence pursuant to A.R.S. § 13-705 only occurs when the victim is under fifteen years old. A.R.S. § 13-705(T)(1). Such an expansion does not indicate an intent to transform Arizona's scheme into one with punitive intent. *See Masto*, 670 F.3d at 1053 (explaining punitive intent is the primary consideration under *Smith*'s first step). Rather, it indicates the Arizona Legislature decided to inform the public of certain level one offenders who committed a crime against a child under fifteen, as opposed to the old scheme where the public was only informed if the child was under twelve. *Compare* S.B. 1236 § 1, *with* A.R.S. § 13-3827 (2021). The Court finds the new publishing requirements do not indicate an intent to alter Arizona's regulatory objectives.

---

[5] The statutory definition of "[d]angerous crimes against children" includes more offenses than those listed in A.R.S. § 13-3827(A)(2)(b), (d)-(f), (h)-(m). For example, it includes crimes like second degree murder, aggravated assault, and involving or using minors in drug offenses. A.R.S. § 13-705(T)(1)(a)-(b), (m).

Finally, before the enactment of Senate Bills 1236 and 1404, only level two and level three sex offenders had their information disseminated to the local community. A.R.S. § 13-3825(C) (2021). Senate Bill 1404 expands community notification to "level one offenders who have been convicted of a dangerous crime against children, as defined in section 13-705." S.B. 1404 § 3. That expansion, though, is consistent with the underlying purpose of Arizona's community notification scheme: to protect the community from potential repeat sex offenders. *See Clark*, 836 F.3d at 1016. Sex offenders convicted of a dangerous crime against children have previously targeted some of the most vulnerable members of the community—children under fifteen. *See* A.R.S. § 13-705(T)(1). Making parents aware of their presence only furthers the nonpunitive goals of Arizona's scheme. The Court, therefore, finds the new notification requirements do not indicate an intent to alter Arizona's regulatory objectives.

Plaintiffs argue punitive intent is shown through the statements of a single state legislator. (Doc. 14 at 16.) Senator Janae Shamp, the sponsor of Senate Bills 1236 and 1404, issued a press release after the Governor signed both bills. Part of the press release said:

> This session, I made it my goal to be a living nightmare for sex offenders . . . . I introduced several bills, including SB 1236 and SB 1404, to protect our state's most innocent and vulnerable, while increasing consequences for criminals who commit these horrific crimes. [Dangerous crimes against children] include sex trafficking, mutilation, prostitution, and commercial exploitation. These crimes have lifelong, and potentially deadly effects on a child. Every parent and every school deserves to know who these criminals are in order to better protect their children.

Arizona Senate Republicans, *Senator Shamp Champions Legislation to Protect Arizona's Children*, Off. Website of the Ariz. State Senate Republican Caucus (Apr. 16, 2024), https://www.azsenaterepublicans.gov/post/senator-shamp-champions-legislation-to-protect-arizona-s-children (internal quotation marks omitted).

It is well established legislative intent cannot be gleaned from a single legislator's statements. *See Ratha v. Rubicon Res., LLC*, 111 F.4th 946, 968 (9th Cir. 2024). This is

especially true when the statement was made after the legislation was enacted. *See id.* As the United States Supreme Court explained, "[w]hat motivates one legislator to make a [statement] about a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). Senate Bills 1236 and 1404 are fairly read as in line with Arizona's preestablished and judicially recognized regulatory goals. Thus, the Court finds Plaintiffs' argument unpersuasive.

Plaintiffs also argue punitive intent is shown through comments made during committee hearings on Senate Bills 1236 and 1404. (*See, e.g.*, Doc. 95 at 2-3.) Discussions held during a committee hearing are part of a bill's legislative history, which the Court can consider when textual indicators of intent are lacking. *See Ratha*, 111 F.4th at 968. But the text of Senate Bills 1236 and 1404 is sufficiently clear to find a lack of punitive intent. What's more, even assuming Plaintiffs' argument has some merit, it asks the Court to invalidate the significant bipartisan support each bill received throughout the legislative process based on conversations between a select group of legislators. That, in essence, creates the same interpretive problem as relying on Senator Shamp's press release. *See O'Brien*, 391 U.S. at 384. Accordingly, the Court concludes Senate Bills 1236 and 1404 do not indicate an intent to impose criminal punishment under *Smith*'s first step.

### ii.  Punitive Purpose or Effect

Even when laws are enacted with a regulatory goal in mind, they can still violate the Ex Post Facto Clause by being "so punitive either in purpose or effect as to negate the State's intention to deem [them] civil." *Smith*, 538 U.S. at 92. Five factors help delineate when punitive effect has occurred. *Id.* at 97. They are "the degree to which the regulatory scheme imposes a sanction that (1) has historically been regarded as punishment; (2) constitutes an affirmative disability or restraint; (3) promotes the traditional aims of punishment; (4) is rationally connected to a nonpunitive purpose; and (5) is excessive in relation to the identified nonpunitive purpose." *Masto*, 670 F.3d at 1055. When weighing these factors, "'only the clearest proof' of punitive effect is sufficient to override the . . . legislature's intent to create a civil regulation." *Id.* (quoting *Smith*, 538 U.S. at 92).

1    This is a high burden; "even a showing that most of the relevant factors weigh in favor of

2    considering a punishment criminal in nature may be insufficient to transform [a civil law]

3    into a criminal punishment." *United States v. Reveles*, 660 F.3d 1138, 1143 (9th Cir. 2011).

4                    **a.    Historical Form of Punishment**

5            The first *Smith* factor analyzes "the degree to which the regulatory scheme imposes

6    a sanction that . . . has historically been regarded as punishment." *Masto*, 670 F.3d at 1055.

7    This factor helps discern punitive effect "because a State that decides to punish an

8    individual is likely to select a means deemed punitive by our tradition, so that the public

9    will recognize it as such." *Smith*, 538 U.S. at 97.

10           Plaintiffs argue "the judicial history in Arizona" has traditionally viewed sex

11   offender registration as punitive. (Doc. 95 at 4.) Plaintiffs recognize *Smith* and *Trujillo*

12   "concluded that registration laws have not been historically regarded as punishment." (*Id.*)

13   Yet Plaintiffs claim "*Smith* and *Trujillo* cannot erase the fact that for at least three decades

14   registration laws were recognized as punishment in Arizona." (*Id.*)

15           Plaintiffs' reference invokes *State v. Noble*, 171 Ariz. 171 (1992). There, the

16   Arizona Supreme Court held sex offender registration was a historical form of punishment.

17   *Id.* at 176. The court, however, later overruled *Noble*'s holding in *Trujillo* and affirmed that

18   Arizona follows federal precedent under the first *Smith* factor. 248 Ariz. at 480

19   ("Nonetheless, we agree with *Smith* and disapprove *Noble*'s conclusion on this point.").

20   Thus, *Noble* is only relevant to the extend federal precedent allows states like Arizona to

21   have a unique understanding of punishment.

22           In *Smith v. Doe*, the United States Supreme Court held registration and notification

23   requirements do not align with a historical understanding of punishment. 538 U.S. at 98-99.

24   To reach this conclusion, the *Smith* court compared registration and notification

25   requirements against colonial-era punishments like public shaming, humiliation, and

26   banishment. *Id.* at 98. The Court found those colonial-era penalties were dissimilar from

27   registration and notification because they did not involve the dissemination of truthful

28   information in furtherance of a legitimate governmental interest. *Id.* at 98-99.

From *Smith*'s reasoning, it is apparent this first factor compares founding-era punishments against modern legislation. *See id.* Thus, any Arizona "judicial history" is irrelevant to the Court's analysis. (Doc. 95 at 4.) Senate Bills 1236 and 1404 only concern Arizona's registration and notification requirements. *Smith* and *Trujillo* have already held those types of requirements do not align with a historical understanding of punishment. 538 U.S. at 98; 248 Ariz. at 480-81. The Court concludes Senate Bills 1236 and 1404 do not impose a historical form of punishment. This means the first *Smith* factor indicates the effect of Senate Bills 1236 and 1404 are regulatory and nonpunitive.

### b.    Affirmative Disability or Restraint

The second *Smith* factor analyzes "the degree to which the regulatory scheme . . . constitutes an affirmative disability or restraint." *Masto*, 670 F.3d at 1055. This factor looks at the effects of a challenged law by asking whether it prevents the regulated class from pursuing certain activities, careers, or places to live. *See Smith*, 538 U.S. at 99-100.

Plaintiffs argue affirmative disability or restraint is shown through the "employment, housing, mental health, and custodial and legal decision-making concerns" they would face if Senate Bills 1236 and 1404 went into effect. (Doc. 95 at 4.) The *Smith* court considered a similar argument and held "substantial occupational or housing disadvantages" do not constitute affirmative disability or restraint because those "consequences flow . . . from the fact of conviction, already a matter of public record." *See* 538 U.S. at 100-01. Plaintiffs' alleged injuries flow from their prior convictions. Thus, even if those injuries are accurate, they would still not impose any affirmative disability or restraint under *Smith*. *See id.*

Amicus Arizona Civil Liberties Union (the "AzCLU") also discussed affirmative disability or restraint in its briefing to the Court. The AzCLU argues Arizona's registration scheme imposes significant affirmative disabilities and restraints on sex offenders. (Doc. 122 at 5.) The AzCLU compares Arizona's scheme against the statute found constitutional in *Smith*. (*Id.* at 5-6.) It notes Arizona's scheme is different because it requires sex offenders

to update their driver's license photo and address annually, register their information in person, and not live within one thousand feet of schools and childcare facilities. (*Id.*) The AzCLU further emphasizes Arizona's scheme allows law enforcement to conduct annual, unannounced checks of a sex offender's home. (*See id.* at 6.) Based on these differences, the AzCLU believes Arizona's scheme imposes greater disability and restraint than the statute considered in *Smith*. (*See id.*) It asks the Court to find the second *Smith* factor favors finding punitive effect.

Much of the AzCLU's argument is foreclosed by the Ninth Circuit Court of Appeals opinion in *Masto*. There, sex offenders challenged a Nevada law under the Ex Post Facto Clause, and their argument under the second *Smith* factor also attempted to show affirmative disability through an in-person registration requirement. *Masto*, 670 F.3d at 1051, 1056. The Ninth Circuit read *Smith* as not "holding that in person registration necessarily constitutes an affirmative disability" because "[t]he requirement that sex offenders present themselves for fingerprinting is not akin to imprisonment, and the burden remains less onerous than occupational debarment." *Id.* at 1056-57. Notably, the Nevada statute at issue in *Masto* required certain sex offenders to update their information every ninety days, but the court still held it did not impose an affirmative disability. *Id.*

Sex offenders in Arizona must update their registration information annually or within seventy-two hours of their information becoming outdated. *See* A.R.S. § 13-3821(J); A.R.S. § 13-3822. They also must register with the local sheriff's office anytime they remain in a new county for more than seventy-two hours. A.R.S. § 13-3821(A). Senate Bill 1404 affects those requirements by obligating sex offenders to now provide their child's name and enrollment status during registration. S.B. 1404 §§ 1-2.

Most of Arizona's reporting requirements are predicated on a voluntary act (*i.e.*, a sex offender staying in a new county for more than seventy-two hours or deciding to move or otherwise change their registration information). The only requirement not predicated on a voluntary act is sex offenders needing to update their registration information every

year. A.R.S. § 13-3821(J). In *Masto*, the Ninth Circuit upheld a similar requirement that required sex offenders to update their information every three months. 670 F.3d at 1056. When compared, Arizona's in-person registration requirement is less restrictive than the one upheld in *Masto*. *See id.* The Court, therefore, finds Arizona's one year requirement does not impose affirmative disability. *See id.* Regarding Arizona's other registration requirements, the Court finds that none are akin to imprisonment or as onerous as occupational disbarment. *See id.* at 1056-57; *see also Smith*, 538 U.S. at 100.

Next, the AzCLU argues affirmative disability is shown through level three sex offenders being unable to live within one thousand feet of schools and childcare facilities. (Doc. 122 at 6); *see also* A.R.S. § 13-3727(A). Senate Bills 1236 and 1404 do not implicate this restriction. The AzCLU's argument, therefore, is beyond the scope of this lawsuit and the narrow question at issue here—whether Senate Bills 1236 and 1404 are so punitive in their effect to negate the Arizona Legislature's intent to enact a regulatory law. *Smith*, 538 U.S. at 92.

Finally, the AzCLU argues affirmative disability is shown through sex offenders being subject to annual, unannounced checks by law enforcement. (Doc. 122 at 6.) The AzCLU does not provide a specific citation for its assertion that sex offenders are subject to annual, unannounced checks. But A.R.S. § 13-3827(G) requires the Arizona Department of Public Safety to annually verify the addresses of all sex offenders. Senate Bills 1236 and 1404 do not implicate this restriction. The argument is also beyond the scope of this lawsuit. *Smith*, 538 U.S. at 92.

The Court, therefore, concludes Senate Bills 1236 and 1404 do not impose any affirmative disability or restraint. The second *Smith* factor indicates the effects of Senate Bills 1236 and 1404 are regulatory and nonpunitive.

### c.    Traditional Aims of Punishment

The third *Smith* factor analyzes "the degree to which the regulatory scheme . . . promotes the traditional aims of punishment," which are deterrence and retribution. *Masto*, 670 F.3d at 1055, 1057. Every form of government regulation includes

some degree of deterrent effect, so *Smith*'s third factor compares a challenged law against the normal consequences of government conduct. *See Smith*, 538 U.S. at 102.

Plaintiffs argue "decades of data [has] found no significant evidence that registries prevent sex crimes, and [instead] indicate that the laws imposed on sex offenders make them *more likely* to commit crimes (with no sexual element) in the future due to the harsh restrictions that impact housing, employment, and supportive community resources." (Doc. 95 at 5.) Plaintiffs provide an expert report to support their argument. (Doc. 95-1.) The report draws on publications and online research to conclude that incarcerated sex offenders "have decreased levels of sexual and non-sexual recidivism, as compare[d] to other types of criminal typologies." (*See id.* ¶ 3, ¶ 8.) It also concludes "empirical research" indicates the risk of recidivism among incarcerated sex offenders "varies based on [the] individual and the circumstances." (*See id.* ¶ 13.) And incarcerated sex offenders "do not present [an] enduring risk of sexual [re]offending across the[ir] lifespan" because the "risk is decreased by the amount of time offense-free, as well as the age of the individual." (*See id.* ¶ 18.)

Plaintiffs' expert report does not address the degree to which Senate Bills 1236 and 1404 "promote[] the traditional aims of punishment." *Masto*, 670 F.3d at 1055. Instead, it makes generalized conclusions about sex offenders and their likelihood to reoffend. (*See* Doc. 95-1 ¶ 3, ¶ 8, ¶ 13, ¶ 18.) Those conclusions are not helpful to the Court's analysis under the third *Smith* factor.

Moreover, Plaintiffs' argument that "the laws imposed on sex offenders make them *more likely* to commit crimes" cuts in favor of finding Senate Bills 1236 and 1404 as regulatory and nonpunitive. (Doc. 95 at 5.) If registration and notification requirements encourage lawlessness, as Plaintiffs suggest, then they are not serving any deterrent effect and thus not promoting a traditional aim of punishment. *See Masto*, 670 F.3d at 1055.

With there being no direct challenge to Senate Bills 1236 and 1404 under this factor, the Court concludes Senate Bills 1236 and 1404 do not promote a traditional aim of punishment. The third *Smith* factor indicates the effects of both bills are regulatory and

1    nonpunitive.

2    **d.      Rational Connection to a Nonpunitive Purpose**

3    The fourth *Smith* factor analyzes "the degree to which the regulatory scheme . . . is

4    rationally connected to a nonpunitive purpose." *Masto*, 670 F.3d at 1055. The Supreme

5    Court identifies this factor as the most significant when determining punitive effect. *Smith*,

6    538 U.S. at 102.

7    Plaintiffs argue Senate Bills 1236 and 1404 are not rationally connected because

8    they "eliminate the narrow tailoring to any civil regulatory purpose." (Doc. 95 at 5.)

9    Plaintiffs explain Arizona's scheme prior to the enactment of Senate Bills 1236 and 1404

10   "had a rational connection to the State's interest in public safety." (*Id.*) But by changing

11   the notification and reporting requirements for level one sex offenders convicted of a

12   dangerous crime against children, Plaintiffs believe there is no longer any "connection

13   between notifying the community . . . and public safety." (*Id.*)

14   In *Smith*, the United State Supreme Court considered a registration and notification

15   law that did not tailor between different types of offenders. *See* 538 U.S. at 90-91. Despite

16   this, the Court still held the statute was rationally connected to a legitimate nonpunitive

17   purpose of "public safety, which [the statute] advanced by alerting the public to the risk of

18   sex offenders in their community." *See id.* at 102-03. The Court explained a statute should

19   not be "deemed punitive simply because it lacks a close or perfect fit with the nonpunitive

20   aim it seeks to advance." *Id.* at 103. Rather, the focus should be on the broader goals of the

21   legislation at issue. *See id.*

22   Like *Smith*, "Arizona's registration [and notification scheme] clearly has 'a

23   legitimate nonpunitive purpose of public safety . . . advanced by alerting the public to the

24   risk of sex offenders.'" *See Clark*, 836 F.3d at 1018 (quoting *Smith*, 538 U.S. at 102-03).

25   Senate Bills 1236 and 1404 are fairly read as in line with Arizona's preestablished and

26   judicially recognized goal of public safety. *See supra* Section III(A)(1)(i). Thus, both bills

27   are rationally connected to a nonpunitive purpose.

28

Plaintiffs attempt to demonstrate a lack of rational connection by arguing Senate Bills 1236 and 1404 are not a close or perfect fit to Arizona's goal of public safety. (*See* Doc. 95 at 5.) *Smith*, however, says such a connection is not required. *See* 538 U.S. at 103. The Court, therefore, concludes Senate Bills 1236 and 1404 are rationally connected to the nonpunitive purpose of public safety. The fourth *Smith* factor indicates the effects of both bills are regulatory and nonpunitive.

### e.    Excessive in Scope

The final *Smith* factor analyzes "the degree to which the regulatory scheme . . . is excessive in relation to the identified nonpunitive purpose." *Masto*, 670 F.3d at 1055.

This factor represents the cornerstone of Plaintiffs' ex post facto argument. Plaintiffs argue the registration scheme that was in place before Senate Bills 1236 and 1404 "ha[d] always focused on the actual offender . . . *not* the offense they may have been charged with many years ago." (Doc. 14 at 11.) That individual tailoring, according to Plaintiffs, is eliminated by Senate Bills 1236 and 1404 and creates a system where "registration is no longer reasonably related to providing the public with notification commensurate to the danger posed" by individual offenders. (*Id.* at 13.) Plaintiffs argue this change means Senate Bills 1236 and 1404 "are not tailored to advance the State's interest in public safety and are excessive in relation to their regulatory purpose." (*Id.* at 11.) They conclude by noting Senate Bills 1236 and 1404 were "not the result of any study or finding that low level registrants . . . pose[d] any risk to the community." (*Id.* at 14.)

Defendants respond that Plaintiffs' "argument is directly foreclosed by *Smith*." (Doc. 86 at 13.) They argue "Arizona's registration laws are actually *narrower* than the laws upheld in *Smith*." (*Id.* at 14.) Defendants, therefore, believe *Smith* expressly allows the Arizona Legislature to tailor their statutory scheme however they please. (*See id.*) Defendants conclude by arguing the Arizona Legislature was not required to conduct a study before passing Senate Bills 1236 and 1404. (*See id.*)

In *Smith*, the United States Supreme Court upheld a statute requiring "any sex offender or child kidnapper who is physically present in the state . . . to register with the

local law enforcement authorities" and have their information published on the internet. 538 U.S. at 90-91 (internal quotation marks omitted). When deciding whether the law was excessive, the Court noted "the Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments." *Id.* at 103. Nor does the clause automatically make a statute punitive because a state decided "to legislate with respect to convicted sex offenders as a class, rather than require individual determinations of their dangerousness." *Id.* at 105. *Smith* thus forecloses Plaintiffs' other argument that Arizona's scheme requires tailoring to be constitutional. *See id.* at 105. It does not, however, foreclose Plaintiffs' argument that Senate Bills 1236 and 1404 are unreasonable in light of their nonpunitive objectives. *See id.* That question requires further analysis.

The reasonableness inquiry asks "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *See id.* It does not ask "whether the legislature has made the best choice possible to address the problem it seeks to remedy." *See id.*; *see also Masto*, 670 F.3d at 1057. In Arizona, a "[d]angerous crime against children" means a child under fifteen years of age was the victim of a statutorily enumerated crime. *See* A.R.S. § 13-705(T). That victim profile, coupled with the fact sex offenders have a "frightening and high" risk of recidivism, could have prompted the enactment of Senate Bills 1236 and 1404. *See Smith*, 538 U.S. at 103 (quoting *McKune v. Lile*, 536 U.S. 24, 34 (2002)); *see also id.* (assessing reasonableness based on what the legislature could have concluded). Children under the age of fifteen generally have no ability to protect themselves, and their safety is almost entirely dependent on their parents or legal guardians or law enforcement. By increasing the notification requirements for certain level one sex offenders, Senate Bills 1236 and 1404 are reasonably related to the legitimate interest of public safety because they allow parents and guardians to choose the amount of interaction and exposure their child has with a sex offender.

Moreover, the Arizona Legislature could have concluded the reporting requirements in Senate Bill 1404 gave law enforcement another "valuable tool" to locate sex offenders. *Trujillo*, 248 Ariz. at 478. If a sex offender has legal custody of a child, it is reasonable to

assume they may be found at their child's school. This is especially true in the case of an absconding sex offender. In those instances, the child's school may provide a convenient location for the sex offender to contact their child while avoiding police. Therefore, the increased ability for law enforcement to locate a sex offender under Senate Bill 1404 means the bill reasonably relates to public safety.

Plaintiffs argue Senate Bills 1236 and 1404 are unreasonable because they were "not the result of any study or finding that low level registrants . . . pose any risk to the community." (Doc. 14 at 14.) They provide authority from the Sixth Circuit Court of Appeals and some state courts to support their argument. (Doc. 95 at 6-7.)

The Court acknowledges the cases cited by Plaintiffs found ex post facto violations. *See, e.g.*, *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016) (finding amendments to Michigan's sex offender law were unconstitutional). But other cases decided by the United States Supreme Court and Ninth Circuit Court of Appeals, such as *Smith*, *Masto*, and *Clark*, are binding on this Court's reasoning, and none of those cases suggest reasonableness depends on a study or finding. *See* 538 U.S. at 104-05; 670 F.3d at 1057; 836 F.3d at 1018-19. In addition, the Court notes the cases cited by Plaintiffs concern statutes that differ from Arizona's scheme. *See, e.g.*, *Does # 1-5*, 834 F.3d at 698 (analyzing a statute that prevented sex offenders "from living, working, or '*loitering*' within 1,000 feet of a school") (emphasis added); *Wallace v. State*, 905 N.E. 2d 371, 383 (Ind. 2009) ("In this jurisdiction the Act makes information on all sex offenders available to the general public without restriction and without regard to whether the individual poses any particular future risk."). Thus, Plaintiffs' argument is unpersuasive. The Court concludes Senate Bills 1236 and 1404 are not excessive in relation to their identified nonpunitive purpose of public safety. The final *Smith* factor indicates the effects of both bills are regulatory and nonpunitive.

Having found none of the *Smith* factors point toward punitive effect, Plaintiffs' ex post facto argument is not likely to succeed on the merits. Senate Bills 1236 and 1404 fit comfortably within Arizona's nonpunitive regulatory scheme, and neither bill comes close

1    to imposing sanctions evincing punitive purpose or effect. *See Masto*, 670 F.3d at 1053.

2    ### 2.    Procedural Due Process

3    Procedural due process claims are analyzed in two steps. "[T]he first asks whether

4    there exists a liberty or property interest which has been interfered with by the State; the

5    second examines whether the procedures attendant upon that deprivation were

6    constitutionally sufficient." *United States v. Juvenile Male*, 670 F.3d 999, 1013 (9th Cir.

7    2012) (quoting *Carver v. Lehman*, 558 F.3d 869, 872 (9th Cir. 2009)).

8    Plaintiffs argue registration and notification requirements implicate a liberty interest

9    under the stigma-plus standard. (Doc. 95 at 7.) They also argue Senate Bills 1236 and 1404

10   lack constitutionally sufficient procedures because "Arizona's . . . public notification

11   scheme has always been rationalized by a need to inform the community for its safety."

12   (*See id.* at 8.)

13   The Ninth Circuit Court of Appeals has not decided whether registration and

14   notification requirements implicate a liberty interest under the Due Process Clause. But it

15   has considered whether the procedures attendant to a presumed deprivation are

16   constitutionally sufficient. In *Masto*, the Ninth Circuit considered a state law that based

17   registration and notification requirements "solely on [the offender's] crime of conviction."

18   *See* 670 F.3d at 1050. The sex offenders in that case argued the Due Process Clause

19   required the state to provide a "hearing to determine whether or not they were in fact

20   convicted." *Id.* at 1059. The court held a hearing would be a "bootless exercise"

21   considering "the fact of conviction is something 'that a convicted offender has already had

22   a procedurally safeguarded opportunity to contest'" at trial. *See id.* (quoting *Conn. Dep't

23   of Pub. Safety v. Doe*, 538 U.S. 1, 7-8 (2003)). Thus, there was no factual dispute a hearing

24   could serve to resolve. *Id.*

25   The changes implemented by Senate Bills 1236 and 1404 turn on a level one

26   offender being convicted of a "dangerous crime against children." S.B. 1236 § 1; S.B. 1404

27   §§ 1-3. Like *Masto*, that classification is made at trial, *see, e.g.*, *State v. Smith*, 250 Ariz.

28   69, 94 (2020), meaning level one offenders already had "a procedurally safeguarded

1    opportunity to contest" the classification. *See Masto*, 670 F.3d at 1059. As such, requiring

2    Arizona conduct a hearing on the applicability of Senate Bills 1236 and 1404 to individual

3    level one offenders would be a "bootless exercise." *See id.* There are no remaining factual

4    disputes a hearing could resolve. *See id.*

5         Plaintiffs attempt to distinguish Senate Bills 1236 and 1404 from *Masto* because

6    "Arizona's . . . public notification scheme has always been rationalized by a need to inform

7    the community for its safety." (Doc. 95 at 7-8.) That argument, however, is irrelevant. "The

8    Due Process Clause does not entitle an individual to a hearing unless there is 'some factual

9    dispute' that a hearing could serve to resolve." *Masto*, 670 F.3d at 1059. The underlying

10   purpose of Arizona's notification scheme does create a factual dispute that needs resolving.

11   Level one sex offenders were either convicted of a dangerous crime against children at trial

12   or they were not. As such, the Court finds Plaintiffs' argument unpersuasive.

13        Plaintiffs' procedural due process claim is not likely to succeed on the merits.

### 3.    Substantive Due Process

15        Substantive due process claims "first consider whether the statute in question

16   abridges a fundamental right." *Juvenile Male*, 670 F.3d at 1011. If the answer is yes, "the

17   statute will be subject to strict scrutiny and is invalidated unless it is 'narrowly tailored to

18   serve a compelling state interest.'" *Id.* at 1012 (quoting *Reno v. Flores*, 507 U.S. 292, 302

19   (1993)). Otherwise, "the statute need only bear a 'reasonable relation to a legitimate state

20   interest to justify the action.'" *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 722

21   (1997)).

22        Plaintiffs do not make any substantive due process arguments in their Motion for a

23   Preliminary Injunction. Plaintiffs, therefore, fail to satisfy their burden for a preliminary

24   injunction. *Winter*, 555 U.S. at 20 (stating the burden rests with the moving party).

25        Even assuming Plaintiffs' argument was adequately raised, it would still fail under

26   the governing law. Sex offenders do not have a fundamental right to be free from

27   registration schemes, and as previously discussed herein, Senate Bills 1236 and 1404

28   satisfy rational basis review because they are reasonably related to Arizona's established

1  sex offender registration scheme. *See Juvenile Male*, 670 F.3d at 1012; *supra* Section

2  III(A)(1)(ii)(d).

3  **4.    Equal Protection Clause**

4  The Equal Protection Clause requires "strict scrutiny if the aggrieved party is a

5  member of a protected or suspect class, or otherwise suffers the unequal burdening of a

6  fundamental right." *Juvenile Male*, 670 F.3d at 1009. Sex offenders are not a protected

7  class. *Id.* Legally defined offender classifications based on criminal history is not a suspect

8  classification. *See United States v. LeMay*, 260 F.3d 1018, 1030 (9th Cir. 2001); *Benson v.*

9  *Ariz. State Bd. Of Dental Examiners*, 673 F.2d 272, 277 n.15 (9th Cir. 1982) (explaining

10  suspect classifications involve distinctions based on immutable characteristics like race and

11  nationality, while quasi-suspect classifications involve distinctions based on gender). And

12  "persons who have been convicted of serious sex offenses do not have a fundamental right

13  to be free from registration and notification requirements." *Doe v. Tandeske*, 361 F.3d 594,

14  597 (9th Cir. 2004).

15  When government action does not implicate a core aspect of the Equal Protection

16  Clause, rational basis review applies. *Juvenile Male*, 670 F.3d at 1009. Rational basis

17  review asks if "there is any reasonably conceivable state of facts that could provide a

18  rational basis for the classification." *F.C.C. v. Beach Commc'ns. Inc.*, 508 U.S. 307, 313

19  (1993).

20  Plaintiffs agree rational basis review applies. (*See* Doc. 95 at 7.) They argue Senate

21  Bills 1236 and 1404 are irrational because "[t]here is no meaningful or demonstrated

22  distinction between" level one sex offenders who have committed a dangerous crime

23  against children and level one offenders who have not. (*See* Doc. 14 at 18.) Both groups,

24  according to Plaintiffs, "committed an offense that requires sex offender registration,

25  [were] evaluated by [the Department of Public Safety], and [were] found to be the same

26  low risk of reoffending." (Doc. 95 at 7.)

27  Senate Bills 1236 and 1404 promote the legitimate governmental interest of public

28  safety. *See supra* Section III(A)(1)(ii)(d). They effectuate that interest by requiring

increased notification requirements for sex offenders who pose a greater risk to the community based on their victim profile, and by equipping law enforcement with additional information to locate offenders. This satisfies rational basis review. *Beach Commc'ns*, 508 U.S. at 313 (stating rational basis review only requires there be "any reasonably conceivable state of facts that could provide a rational basis for the classification").

### 5.    Vagueness

The prohibition against vague laws is rooted in the Due Process Clauses of the Fifth and Fourteenth Amendments. *See United States v. Williams*, 553 U.S. 285, 304 (2008); *see also* Carissa Byrne Hessick, *Vagueness Principles*, 48 Ariz. St. L.J. 1137, 1140-41 (2016) (discussing the intersection of insufficiently precise language and the due process clauses). A criminal statute is vague when it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Beckles v. United States*, 580 U.S. 256, 262 (2017). When vagueness is challenged outside the confines of the First Amendment, the challenging party must sustain an as-applied challenge before the court will consider facial vagueness. *Kashem v. Barr*, 941 F.3d 358, 375 (9th Cir. 2019).

Plaintiffs argue the phrases "appropriate community groups," "prospective employers," and "enrollment status" are impermissibly vague. (Doc. 14 at 18-19.) "[A]ppropriate community groups" and "prospective employers" are part of Arizona's community notification requirements, which mandate local law enforcement to "notify the community of the offender's presence in the community pursuant to subsection C of this section." A.R.S. § 13-3825(D). Subsection (C) requires the dissemination of a sex offender's information "to the surrounding neighborhood, area schools, appropriate community groups and prospective employers." A.R.S. § 13-3825(C)(1). Senate Bill 1404 adds to these requirements by directing law enforcement to disseminate an offender's information to "the[ir] child's school" if a sex offender "has legal custody of a child." S.B.

1404 § 3.

The phrases "appropriate community groups" and "prospective employers" do not impose a criminal offense on sex offenders. Rather, they direct where law enforcement should disseminate information as part of their community notification requirements. Such a command does not implicate the void-for-vagueness doctrine. *See Beckles*, 580 U.S. at 266 (explaining the vagueness doctrine only applies when a law regulates a person or entity).[6] Thus, Plaintiffs' challenge as to those phrases fail.

That leaves Plaintiffs' challenge to the phrase "enrollment status." (Doc. 14 at 19.) Senate Bill 1404 requires a sex offender who "has legal custody of a child who is enrolled in school" to provide their "child's name and enrollment status" to the local sheriff's office. S.B. 1404 § 1. "School" is defined in Senate Bill 1404 as "a public or nonpublic kindergarten program, common school or high school." *Id.* If there is a change in enrollment status, a sex offender must provide the sheriff's office with updated information. *Id.* at § 2. Failure to comply with the enrollment or updating requirement is a class 4 felony. A.R.S. § 13-3824.

An ordinary person would understand that "enrollment status" refers to the earlier clause "a child who is enrolled in school." *See id.* at § 1. Senate Bill 1404 adequately defines what institutions are considered a "school." *Id.* Accordingly, the phrase "enrollment status" is sufficiently clear on what information a sex offender must provide and what information the sheriff's office must collect. *See Beckles*, 580 U.S. at 266. Plaintiffs' challenge as to this phrase also fails.

Because none of the phrases challenged by Plaintiffs run afoul of the void-for-vagueness doctrine, their argument is not likely to succeed on the merits.

### 6.    First Amendment

The First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). That later right—the

---

[6] In addition, both phrases have been in Arizona law since at least 1997. *See* 1997 Ariz. Sess. Laws ch. 136 § 26. That provides some persuasive evidence that both terms are sufficiently clear.

right to refrain from speaking—implicates the compelled speech doctrine. The compelled speech doctrine involves two, broad First Amendment protections. *See* Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355, 358 (2018). It protects against "speech compulsions that also restrict speech—for instance by compelling newspaper editors or parade organizers to include certain material, and thus restricting them from creating precisely the newspaper or parade that they want to create." *Id.* It also protects against "some 'pure speech compulsions,' which do not restrict speech but which unduly intrudes on the compelled person's autonomy." *Id.*

Plaintiffs offer only bare assertions in their Motion for a Preliminary Injunction. They argue Senate Bill 1404 "compel[s] Level One registrants to engage in speech which they do not wish to make." (*See* Doc. 14 at 19.) And "the amendment[] forces parents to disclose identifying and/or locating information regarding their minor children." (*Id.* at 20.) Plaintiffs' reply brief is equally unhelpful. They cite to *Book People, Inc. v. Wong*, 91 F.4th 318, 399-40 (2024), to support their First Amendment argument. (Doc. 95 at 8.) *Wong*, however, concerns compelled commercial speech, whereas Plaintiffs' First Amendment claim concerns purely non-commercial speech. *See* 91 F.4th at 399-40; (Doc. 14 at 19-20.) Thus, Plaintiffs fail to satisfy their burden for a preliminary injunction. *See Winter*, 555 U.S. at 20 (stating the burden rests with the moving party). Even assuming that Plaintiffs' argument was adequately raised, it would still fail under the governing law.

In *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), the United States Supreme Court considered a state law that required professional fundraisers to disclose to potential donors "the average percentage of gross receipts actually turned over to charities . . . within the previous 12 months." *Id.* at 786. The Court began by stating that "[m]andating speech that a speaker would not otherwise make" implicates the compelled speech doctrine, regardless of whether the compulsion involves a statement of fact or statement of opinion. *See id.* at 795, 798. The Court then applied a strict scrutiny analysis and held the state did not present a "weighty" enough interest, nor were the means chosen to accomplish the interest narrowly tailored. *See id.* at 798. Yet the

Court noted, "as a general rule," the restriction would have been narrowly tailored if "the State . . . itself publish[ed] the detailed financial disclosure forms it requires professional fundraisers to file." *See id.* at 800.

Senate Bills 1236 and 1404 require certain level one offenders to disclose facts that are then disseminated to the public. S.B. 1236 § 1; S.B. 1404 § 3. Under *Riley*, such a disclosure is mandated speech that must satisfy strict scrutiny. *See United States v. Fox*, 286 F. Supp. 3d 1219, 1223 (D. Kan. 2018). To satisfy strict scrutiny, a law must be narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

The government has a compelling interest in public safety and crime prevention. *See United State v. Salerno*, 481 U.S. 739, 749-50 (1987) (citing *De Veau v. Braisted*, 363 U.S. 144, 155 (1960)). Senate Bills 1236 and 1404 advance those interests by giving law enforcement another "valuable tool" to locate sex offenders and allowing parents to regulate their children's interaction and exposure with a sex offender. *Supra* Section III(A)(1)(ii)(e). Thus, the first step of strict scrutiny is satisfied.

Narrow tailoring requires the information mandated by Senate Bills 1236 and 1404 be sufficiently calibrated toward the government's interest in public safety. *See Twitter, Inc. v. Garland*, 61 F.4th 686, 699 (9th Cir. 2023). When analyzing the fundraising law in *Riley*, the Court suggested "as a general rule" a state could "itself publish the detailed financial disclosure forms it requires professional fundraisers to file." 487 U.S. at 800. The Court explained such a "procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation." *Id.*

Arizona's sex offender registration and notification scheme operates in a similar way to the law suggested in *Riley*. *See Fox*, 286 F. Supp. 3d at 1224. Arizona collects information from offenders during the registration process, and it then disseminates the information through various governmental entities. S.B. 1236 § 1; S.B. 1404 § 3. *Riley* indicates such a system is narrowly tailored. 487 U.S. at 800. Therefore, the requirements

in Senate Bills 1236 and 1404 for certain level one offenders to disclose facts that are later disseminated to the community does not violate the First Amendment. *See Riley*, 487 U.S. at 800; see also Volokh, *supra* at 379 (suggesting "[t]here may be an exception for pure compulsions to state facts to the government").

Senate Bill 1404 also requires sex offenders to turn over information about their children. Reporting the information is mandated, but it is not publicly disclosed. *See* A.R.S. § 13-3823 ("Except for use by law enforcement officers and for dissemination as provided in [A.R.S.] § 41-1750, a statement . . . required by this article shall not be made available to any person."); *see also* A.R.S. § 41-1750 (listing instances where information can be disclosed). The lack of public disclosure means Plaintiffs' First Amendment challenge to Senate Bill 1404's reporting requirements similarly fail under the governing law.

In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), the United State Supreme Court considered the constitutionality of a mandatory flag salute and pledge. *Id.* at 626-27. In its analysis, the Court classified the mandate as solely a conflict between the authority of the state and rights of the individual. *Id.* at 630. One where the state required students to publicly communicate by word and sign their adherence to the government as presently organized or else face punishment. *See id.* at 631, 633. The *Barnette* court found the mandate unconstitutional. *Id.* at 642.

Later, in *Wooley*, the United States Supreme Court explained the interests underlying a compelled speech claim are invasions of "the sphere of intellect and spirit," which the First Amendment reserves from official control. 430 U.S. at 715. There, the Court decided the constitutionality of a state law requiring license plates to bear the motto "Live Free or Die." *Id.* at 707. It noted "the passive act of carrying the state motto on a license plate" involved a less serious infringement upon personal liberties than "[c]ompelling the affirmative act of a flag salute," but the Court emphasized the difference was one of degree and still implicated *Barnette*. *See id.* at 715. The Court explained the state law required individuals act "as a 'mobile billboard' for the State's ideological message" even if they found the message morally objectionable. *See id.*

*Barnette* and *Wooley* indicate the compelled speech doctrine requires the necessary predicate of a publicized message. *See United States v. Arnold*, 740 F.3d 1032, 1034 (5th Cir. 2014). Without such a publication, the content of an individual's speech is not altered and there is no display of a message that an individual may find objectionable. *See Volokh*, *supra* at 358-59. When the government does not disclose the information to the public, an individual's autonomy interests do not warrant First Amendment protection. *See id.* at 368.

Here, the information collected about a sex offender's child is not publicly disseminated. A.R.S. § 13-3823. Thus, the necessary predicate of the compelled speech doctrine is not implicated, and the First Amendment does not protect the disclosure of such information.

Plaintiffs' First Amendment claim is not likely to succeed on the merits.

### 7.    Right to Privacy

The United States Constitution does not expressly guarantee a right to privacy. *Grummett v. Rushen*, 779 F.2d 491, 493 (9th Cir. 1985). But governmental power may be limited in instances where a zone of privacy is fundamental to the concept of ordered liberty or implicit in its design. *See id.*

Plaintiffs argue Senate Bills 1236 and 1404 violate the privacy of children whose parents must disclose their name and enrollment status. (*See* Doc. 14 at 20.) They acknowledge information like someone's name is normally not sensitive enough to receive constitutional protection. (*Id.* (citing *Doe v. Bonta*, 101 F.4th 633, 637 (9th Cir. 2024).) Yet Plaintiffs try to distinguish Senate Bills 1236 and 1404 from this general principle because the contested laws involve the information of minor children. (Doc. 95 at 8-9.)

There is no right to privacy for information collected in a government database. *See Russell v. Gregoire*, 124 F.3d 1079, 1093 (9th Cir. 1997). This is especially true when the information is never publicly disseminated or disclosed. *See Endy v. County of Los Angeles*, 975 F.3d 757, 769 (9th Cir. 2020). Senate Bill 1404 requires sex offenders to disclose information on their children, but that information is never publicly disclosed during the community notification process. S.B. 1404 § 3. Accordingly, the right to privacy

is not implicated.

Even if the right to privacy extended to non-disclosed information, a child's name and enrollment information is not highly sensitive. *See Bonta*, 101 F.4th at 637. In *Russell*, the Ninth Circuit Court of Appeals concluded a sex offender's general vicinity of residence and employer was not "private" enough for constitutional protection. *Russell*, 124 F.3d at 1094. Enrollment information is less sensitive than one's residence, and a person's name similarly does not receive constitutional protection. *See Bonta*, 101 F.4th at 637. Plaintiffs, therefore, are not likely to succeed on the merits of their right to privacy claim under the federal constitution.

In addition, Plaintiffs argue the challenged legislation violates the Private Affairs Clause in the Arizona Constitution. Ariz. Const. art. 2, § 8. The Arizona Supreme Court outlined the contours of its Private Affairs Clause in *State v. Mixton*, 250 Ariz. 282 (2021). The court held the clause is understood as giving "the same general effect and purpose as the Fourth Amendment," and it declined to "expand the Private Affairs Clause's protections beyond the Fourth Amendment's reach, except in cases involving warrantless home entries." *Id.* at 290 (quoting *Malmin v. State*, 30 Ariz. 258, 261 (1926)). From this, the Court finds Arizona's Private Affairs Clause is inapplicable to Plaintiffs' privacy claim.

Plaintiffs are not likely to succeed on the merits of their right to privacy claim under the Arizona Constitution.

### 8.      False Light Invasion of Privacy

Plaintiffs assert a claim for False Light Invasion of Privacy in their Amended Complaint. (Doc. 82 at 52.) Plaintiffs did not address this new claim in their Motion for a Preliminary injunction or in their reply brief. Thus, Plaintiffs fail to satisfy their burden for a preliminary injunction. *See Winter*, 555 U.S. at 20 (stating the burden rests with the moving party).

### B.      Other *Winter* Factors

Likelihood of success on the merits, the first *Winter* factor, "'is a threshold inquiry and is the most important factor' in any motion for a preliminary injunction." *Baird*, 81

F.4th at 1042 (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)). This is "especially true for cases where [a movant] seeks a preliminary injunction because of an alleged constitutional violation." *Id.* In those instances, a finding of likelihood of success on the merits "will almost always demonstrate [a movant] is suffering irreparable harm" and that the third and fourth *Winter* factors tip decisively in a movant's favor. *See id.* But the inverse is also true. When a movant is unable to show a likelihood of success on the merits, or that there is at least a "serious question[] going to the merits," the court need not consider the remaining three factors. *See id.* at 1040; *Shell Offshore, Inc.*, 709 F.3d at 1291.

Plaintiffs are unable to show a likelihood of success on the merits for any of their claims. The Court further finds, for each of Plaintiffs' claims, they have not met the lesser showing of a "serious question[] going to the merits." *Shell Offshore, Inc.*, 709 F.3d at 1291. Therefore, the Court does not need to consider the remaining *Winter* factors. *Baird*, 81 F.4th at 1042. Plaintiffs are not entitled to a preliminary injunction.

## C. Attorney General as a Defendant

In her response to the motion for a preliminary injunction, Attorney General Mayes argues she is not a proper defendant.[7] Whether a state official, acting in their official capacity, is a proper defendant to an action is "the common denominator of two separate inquiries." *Planned Parenthood of Idaho, Inc. v. Wasdin*, 376 F.3d 908, 919 (9th Cir. 2004). The first inquiry asks "whether there is the requisite causal connection between [the official's] responsibilities and any injury that the plaintiffs might suffer." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The second asks whether "jurisdiction over the defendant[] is proper under the doctrine of *Ex parte Young*." *Id.*

The Eleventh Amendment generally prevents federal courts "from entertaining suits brought by a private party against a state or its instrumentalit[ies] in the absence of state consent." *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992). The doctrine of

---

[7] Defendants also argued that the requested injunctive relief was overbroad. (Doc. 86 at 7.) The Court declines to address this argument because it is denying Plaintiffs' requested injunction.

1    *Ex parte Young* acts as an exception to the general rule. *See* 209 U.S. 123, 157 (1908). It

2    allows "actions for prospective, declaratory, or injunctive relief against state officers in

3    their official capacities for their alleged violations of federal law," *Coalition to Defend*

4    *Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012), provided the official

5    sued has "some connection with the enforcement of the act." *Ex parte Young*, 209 U.S. at

6    157. That "connection must be fairly direct; a generalized duty to enforce state law or

7    general supervisory power over the persons responsible for enforcing the challenged

8    provision will not subject an official to suit." *Eu*, 979 F.2d at 704.

9         The Attorney General argues she is not a proper party to this litigation because she

10    has no enforcement authority over the statutory changes enacted by Senate Bills 1236 and

11    1404.[8] (Doc. 86 at 6.) In response, Plaintiffs argue the Attorney General has statutory

12    enforcement authority through A.R.S. § 13-3824(A) and A.R.S. § 41-193(A)(5). (Doc. 95

13    at 13.) Plaintiffs cite cases like *Planned Parenthood Arizona, Inc. v. Brnovich*, 172 F. Supp.

14    3d 1075 (D. Ariz. 2016), for support. (*Id.*)

15         Under the Arizona Constitution, "[t]he powers and duties of [the] . . . attorney

16    general . . . shall be as prescribed by law." Ariz. Const. art. 5 § 9. This language is

17    understood as denying the Attorney General any kind of "inherent or common law

18    authority." *See State ex rel. Brnovich v. Ariz. Bd. of Regents*, 250 Ariz. 127, 130 (2020).

19    Instead, a statute must "expressly empower[] the Attorney General to take specified legal

20    actions." *See id.* at 132.

21         Section 41-193(A)(5) reads the Attorney General shall, "[a]t the direction of the

22    governor, or if deemed necessary, assist the county attorney of any county in the discharge

23    of the county attorney's duties." Such language is undoubtedly broad. But as the Arizona

24    Supreme Court held in *State ex rel. Brnovich*, A.R.S. § 41-193 "create[s] duties of legal

25    representation rather than broad grants of authority." 250 Ariz. at 132. The court explained

26    that hundreds of statutes were enacted after A.R.S. § 41-193 to endow the Attorney General

---

[8] Defendants also argued that the requested injunctive relief was overbroad. (Doc. 86 at 7.) The Court declines to address this argument because it is denying Plaintiffs' requested injunction.

with specific legal authority. *See id.* at 132. If A.R.S. § 41-193 were interpreted as granting open-ended discretion to initiate civil litigation or prosecute, those other statutes would become superfluous. *See id.* at 132-33. Plaintiffs, therefore, are incorrect that A.R.S. § 41-193(A)(5) grants enforcement authority over sex offender registration and notification. (Doc. 95 at 13.) It only imposes a generalized duty on the Attorney General to assist the county attorneys in certain circumstances. *See id.* at 132. Within the context of *Ex parte Young*, a generalized duty is too attenuated from the enforcement of Arizona's sex offender scheme to find a waiver of Eleventh Amendment immunity. *See Eu*, 979 F.2d at 704 (stating the connection must be fairly direct).

Section 13-3824(A) states a sex offender "who is subject to registration . . . and who fails to comply with the requirements of this article is guilty of a class 4 felony." This language is not specific enough to endow the Attorney General with enforcement authority. *Compare* A.R.S. § 13-3824(A), *with* A.R.S. § 37-908 ("The attorney general may initiate or defend an action commenced in any court to carry out or enforce this chapter or seek any appropriate judicial relief to protect the interests of this state."). Felonies of this nature are prosecuted by county attorneys. Thus, Plaintiffs are also incorrect that the Attorney General has enforcement authority through A.R.S. § 13-3824(A).

Looking more broadly at Arizona's entire sex offender registration and notification scheme, the only specific mention of the Attorney General is in A.R.S. § 13-3828(F). Subsection (F) requires the Attorney General to give "assistance and information as is reasonably necessary to effectuate the purposes of" Arizona's Sex Offender Management Board. *See id.* That duty does not implicate Senate Bills 1236 and 1404, nor does it have any connection with their enforcement. More importantly, it means there are no statutes "expressly empowering the Attorney General to take specified legal actions" within Arizona's scheme. *State ex rel. Brnovich*, 250 Ariz. at 132. As such, the Court finds the Attorney General lacks enforcement authority over the statutes implicated by Senate Bills 1236 and 1404. *State ex rel. Brnovich*, 250 Ariz. at 132.

A similar conclusion was reached by this Court in *Planned Parenthood Arizona, Inc. v. Brnovich*. There, the Court considered *Ex parte Young* when finding that the director of the Arizona Department of Health Services was an improper party. *See Planned Parenthood Arizona, Inc.*, 172 F. Supp. 3d at 1096. The Court explained that even though the director had "the power and duty to administer and enforce licensure requirements," such power had no connection to the challenged legislation. *See id.* at 1097-98. Here, the Attorney General serves a general law enforcement function within the State of Arizona, but that authority does not intertwine with Senate Bills 1236 and 1404 to create a sufficiently direct connection to their enforcement. *See Eu*, 979 F.2d at 704.

At oral argument, the Attorney General stated A.R.S. § 41-193 grants her supervisory authority over the county attorneys. The Court takes no position on whether this argument is correct. *State ex rel. Brnovich*, 250 Ariz. at 132 (noting A.R.S. § 41-193(A)(5) imposes a duty to "assist[] county attorneys in certain circumstances"). But assuming that it is, there is no evidence indicating the Attorney General has exercised her authority over sex offender registration laws of this nature. Thus, to accept Plaintiffs' position, the Court would effectively transform Plaintiffs' requested prohibitory injunction into a mandatory injunction if it granted the requested relief against the Attorney General. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (explaining mandatory injunctions "order a responsible party to 'take action'") (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). Plaintiffs have not argued for this. (Doc. 14 at 6.)

For the abovementioned reasons, it appears the Attorney General has a compelling argument she should be dismissed from this lawsuit due to Eleventh Amendment immunity. But the Attorney General has not asked the Court to dismiss her from this lawsuit. (Doc. 86 at 29.) Instead, she asks the Court to "deny Plaintiffs request for a preliminary injunction. (*Id.*) Or, at the very least, craft injunctive relief in a way that avoids restraining the Attorney General in her official capacity. (*See id.* at 7.) As such, dismissing the Attorney General from this lawsuit would require the Court to exercise its discretion

*sua sponte*. The better course is a motion brought by the Attorney General.

**IV.    CONCLUSION**

For the reasons stated herein,

**IT IS ORDERED** denying Plaintiffs' Motion (Doc. 14).

**IT IS FURTHER ORDERED** lifting the September 13, 2024, Temporary Restraining Order (Doc. 42).

**IT IS FINALLY ORDERED** affirming the schedule for Defendants to answer or otherwise respond to Plaintiffs' First Amended Complaint (Doc. 82) as December 13, 2024, as stated in the Court's October 30, 2024, Minute Entry (Doc. 121).

Dated this 22nd day of November, 2024.

Michael T. Liburdi
United States District Judge